***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties or their representatives. Having reviewed the competent evidence of record, the Full Commission affirms the Opinion and Award of Deputy Commissioner Harris, with minor modifications.
 *********** EVIDENTIARY RULINGS
Prior to the hearing before the Full Commission, Plaintiff filed two motions to present additional evidence dated March 30, 2011 and May 9, 2011, respectively. In its discretion, pursuant to Rule 701 of the Workers' Compensation Rules of the North Carolina Industrial Commission, the Full Commission hereby DENIES Plaintiff's motions. *Page 2 
 ***********
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner, and in the executed Pre-Trial Agreement, as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act, and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter.
2. An employer-employee relationship existed between Defendant-Employer and Plaintiff.
3. The carrier liable on the risk is First Benefits, Inc.
4. There is no issue as to misjoinder or nonjoinder of parties.
5. Plaintiff's average weekly wage in this claim is $300.00.
6. Plaintiff sustained an injury on January 25, 2008. The injury arose out of and in the course of employment and is compensable.
 *********** EXHIBITS
The following documents were accepted into evidence as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Industrial Commission Forms and filings
 • Exhibit 3: Plaintiff's discovery responses
 • Exhibit 4: Plaintiff's medical records
 • Exhibit 5: Rehabilitation nurse's reports
 • Exhibit 6: Statement from Rock Drug Store *Page 3 
 • Exhibit 7: Market Drugs printout for Plaintiff's mother
 • Exhibit 8: October 5, 2009 functional capacity evaluation report
 • Exhibit 9: ESC documentation
 • Exhibit 10: Check stubs
 • Exhibit 11: Wage information
Transcripts of the depositions of the following were also received post-hearing:
 • Dr. Peter Hurley (with Plaintiff's Exhibit 1)
 • Debra J. Craig, PT, DPT (with Defendants' Exhibit 1)
 *********** ISSUES
1. Whether Defendants are entitled to suspend payment of temporary total disability compensation to Plaintiff, and, if so, from what date?
2. Whether Plaintiff is entitled to a second treatment opinion?
 ***********
Based upon all of the competent credible evidence of record and the reasonable inferences flowing therefrom, the Full Commission makes the following additional:
 FINDINGS OF FACT
1. Plaintiff is 41 years of age, having a date of birth of November 20, 1969.
2. On January 25, 2008, Plaintiff was working as a server in Defendant-Employer's restaurant when she slipped and fell, landing on her outstretched right arm, and injuring her right shoulder. *Page 4 
3. Defendants accepted this claim by filing a Form 60 dated March 7, 2008. Defendants have provided Plaintiff with medical treatment and have paid her ongoing temporary total disability compensation.
4. On January 27, 2008, Plaintiff presented to the emergency room at Catawba Valley Medical Center with complaints of right shoulder and right elbow pain. X-rays taken of Plaintiff's right shoulder and right elbow on that date were negative for acute findings. Plaintiff was diagnosed with right arm contusion and status post fall, and was advised to limit the use of her right arm and to follow up with a primary care physician in one to two days.
5. On February 7, 2008, Plaintiff presented to Dr. Bruce Berry at Hart Industrial Clinic for right shoulder pain which she rated 9 out of 10. Plaintiff was diagnosed with elbow contusion, sprain/strain of the elbow and forearm, and sprain/strain of the shoulder or upper arm. Plaintiff was given an injection of Kenalog in her right shoulder as well as Ibuprofen, Flexeril, and a prescription for Vicodin. X-rays taken of Plaintiff's right shoulder and right elbow again showed no fractures or dislocations.
6. After following up with Dr. Berry a number of times, Plaintiff came under the care of Dr. Peter Hurley, an orthopedic surgeon at Hickory Orthopaedic Center. Dr. Hurley first saw Plaintiff on March 18, 2008, on which date Plaintiff complained of right shoulder and neck pain. After reviewing an MRI of Plaintiff's shoulder taken on March 6, 2008, Dr. Hurley opined that Plaintiff might have a partial tear of her rotator cuff, although he was not sure whether that was the cause of her severe pain. Dr. Hurley referred Plaintiff for EMG and nerve conduction velocity testing and for physical therapy.
7. Plaintiff began physical therapy as recommended by Dr. Hurley. However, as of May 2, 2008, Plaintiff's therapist opined that Plaintiff was not progressing as well as anticipated, *Page 5 
and noted that Plaintiff had attended only eleven sessions and had canceled five sessions during a three month period.
8. On May 22, 2008, Dr. Hurley noted that a second review of Plaintiff's MRI showed a small partial tear of the rotator cuff, but no complete tear. Dr. Hurley opined that he would not operate on Plaintiff based on what he observed on her MRI. Also on May 22, 2008, Dr. Hurley expressed concern about the amount of narcotic pain medication Plaintiff was using, and he recommended that Plaintiff be evaluated by Dr. Russell Gilchrist for non-operative pain intervention.
9. Dr. Gilchrist first saw Plaintiff on June 2, 2008. He noted that Plaintiff's EMG and nerve conduction studies were normal and he diagnosed Plaintiff with right shoulder pain, right C4 and C5 radiculitis, and right suprascapular neuropathy. In order to rule out right C4 versus C5 nerve root impingement as the cause of Plaintiff's symptoms, Dr. Gilchrist recommended an MRI of the cervical spine.
10. Dr. Gilchrist read the MRI of Plaintiff's spine performed June 17, 2008 as showing a minimal broad central bulge at C5-C6 with associated high intensity zone lesion. Dr. Gilchrist recommended a right C5 transforaminal injection.
11. In addition to treating with Dr. Gilchrist, Plaintiff continued to treat with Dr. Hurley who on August 18, 2008 opined that Plaintiff had failed conservative treatment. Dr. Hurley indicated that Plaintiff would be scheduled for arthroscopic subacromial decompression, possible rotator cuff repair, possible biceps tenodesis and possible labral repair. Dr. Hurley opined that Plaintiff would be returned to limited duty work one week after surgery, and that it might be four or five months before she could return to work full duty without restrictions. *Page 6 
12. On November 21, 2008, Plaintiff underwent a second opinion evaluation with Dr. Brian DeLay of OrthoCarolina. After reviewing Plaintiff's records, history and MRI of her right shoulder, and after performing an extensive physical examination, Dr. DeLay diagnosed Plaintiff with right shoulder extreme hypersensitivity, right shoulder probable adhesive capsulitis, right shoulder partial rotator cuff tear, right shoulder biceps tendonitis, and right shoulder acromioclavicular joint mild osteoarthritis. Dr. DeLay opined that Plaintiff's examination was hyper-exaggerated and inconsistent with the findings on her MRI. He further opined that Dr. Hurley's recommendation for right shoulder surgery was Plaintiff's only remaining treatment option, but that he was uncertain whether surgery would benefit Plaintiff given her chronic narcotic medication use.
13. Plaintiff underwent arthroscopic surgery with Dr. Hurley on January 27, 2009.
14. On January 28, 2009, Plaintiff followed up with Dr. Hurley who noted that Plaintiff was experiencing a lot of pain and opined that Plaintiff had a low pain tolerance. Dr. Hurley impressed upon Plaintiff the importance of therapy and rehabilitation.
15. As of April 6, 2009, Plaintiff had missed three out of seven of her physical therapy appointments. On April 23, 2009, Plaintiff indicated that she was unable to participate in physical therapy as she was experiencing dizziness, which she related to taking allergy and anti-depressant medications. Plaintiff drove herself from the appointment despite being instructed to wait for her sister to collect her.
16. On April 27, 2009, Plaintiff failed to attend her physical therapy appointment reportedly due to car trouble.
17. Plaintiff also followed up with Dr. Gilchrist following her surgery. On April 28, 2009, Dr. Gilchrist placed Plaintiff on OxyContin and advised her that she was not allowed to *Page 7 
obtain narcotics from any other sources. He noted, "Over the next three to four months we will titrate her down off this medication."
18. On June 23, 2009, Plaintiff failed to attend an appointment with Dr. Gilchrist, reportedly due to car trouble. The appointment was rescheduled for July 10, 2009, on which date Plaintiff was also scheduled to meet with Dr. Hurley.
19. On July 6, 2009, rehabilitation consultant Connie Cook telephoned Plaintiff to confirm her July 10, 2009 appointments. Ms. Cook also offered to arrange transportation to the appointments for Plaintiff, which Plaintiff declined.
20. Plaintiff failed to attend either appointment on July 10, 2009. The appointment with Dr. Hurley was rescheduled for July 14, 2009, and Plaintiff attended. Plaintiff did not, however, attend the rescheduled appointment with Dr. Gilchrist on July 17, 2009.
21. Dr. Hurley characterized Plaintiff's rotator cuff tear as not very big. He opined that patients with a small tear and biceps repair such as Plaintiff's were typically returned to full duty work without restrictions three to four months after surgery.
22. On July 14, 2009, Dr. Hurley's examination of Plaintiff showed that she had full active and passive range of motion in her right shoulder, and he opined that she had reached maximum medical improvement. Dr. Hurley noted that Plaintiff "could pick up her arm over her head and showed reasonable strength and did not look that uncomfortable but continued to say she had a lot of pain."
23. Also on July 14, 2009, Dr. Hurley assigned permanent work restrictions of no lifting greater than 10 pounds and no overhead lifting based on Plaintiff's statement that she could not do those things. Dr. Hurley testified with respect to his decision to give Plaintiff permanent restrictions that he did not know what to do with Plaintiff in light of her pain and *Page 8 
emotional overlay. He stated further, "So whether it was right or wrong, I tried to accommodate the patient."
24. On July 22, 2009, Defendants filed a Motion to Order Plaintiff to Cooperate with Medical Treatment and Fully Comply with a Functional Capacity Evaluation. Defendants' Motion was granted by then Executive Secretary Tracey H. Weaver in an order filed on September 16, 2009.
25. The functional capacity evaluation was scheduled for October 5 and 6, 2009 at PT Pros in Morganton, North Carolina. Plaintiff reported for the first day of the evaluation as scheduled. The evaluator, physical therapist Debra Craig, utilized the "WorkWell" functional capacity evaluation protocol, which she believed to be a good test because it is primarily based on the evaluator's observations of the subject's muscle recruitment patterns in completing various tasks, rather than the subject's subjective reports of his or her abilities. As Ms. Craig explained, the evaluator notes how the various muscles of the body respond to the tasks to determine whether the subject is giving full effort. Ms. Craig testified that another advantage of the "WorkWell" protocol was the fact that the evaluation took place over two consecutive days, with the result that the evaluator is afforded the opportunity to observe the subject over a longer period of time and the evaluation takes into account the "day after" pain that a subject might feel after completing the first day of testing.
26. Ms. Craig opined that Plaintiff attempted all test items on the first day of the evaluation, but did not give full effort and exhibited self-limiting behavior. In support of her opinion, Ms. Craig noted that Plaintiff demonstrated "global give way weakness" on a test, which generally indicates that the subject is not giving maximal effort. Ms. Craig also noted inconsistencies in Plaintiff's performance on lifting tests, and the fact that Plaintiff did not exert *Page 9 
as much force during pushing-pulling testing as she did opening the door to enter and exit the clinic, which Ms. Craig testified she did without difficulty.
27. As to her opinion that Plaintiff "self-limited" on most of the test items on the first day of the functional capacity evaluation, Ms. Craig testified variously that, "it was limited because it hurt" and, "I can't make a determination of why she self-limited. That's not within my scope of practice. But I can just tell you that she didn't — muscle recruitment, muscle-wise did not demonstrate what I believe to be her maximum ability for whatever reason that she chose." Ms. Craig noted that the term "self-limiting," as used in her report, means, "she did not work to the level that maximal recruitment patterns were observed." Ms. Craig opined that this did not necessarily mean that the subject intended to undermine the results of the test.
28. Plaintiff did not report for the second day of the functional capacity evaluation on October 6, 2009. According to Ms. Craig, Plaintiff did not call the clinic, and the clinic's efforts to reach Plaintiff at the telephone numbers she provided were unsuccessful. Also according to Ms. Craig, Plaintiff did not say anything to her on the first day of the evaluation to suggest that she would not be able to attend the second day. Ms. Craig testified that Plaintiff did not report feeling sick on the first day of the evaluation, and Ms. Craig did not observe Plaintiff exhibit any symptoms of illness.
29. According to her progress report dated October 14, 2009, Ms. Cook received a telephone call from PT Pros on October 6, 2009 indicating that Plaintiff had failed to report for her second day of testing. When Ms. Cook contacted a representative from the company that was to transport Plaintiff to PT Pros, Ms. Cook was informed that a driver had reported to Plaintiff's home prior to the appointment, but when the driver telephoned Plaintiff to inform her that he had arrived, Plaintiff came out to the vehicle and told the driver she had cancelled her *Page 10 
appointment as well as the transportation to the appointment. The driver indicated that no cancellation call had been received from Plaintiff.
30. Plaintiff testified that she could not report for the second day of the functional capacity evaluation because she was up during the preceding night with flu-like symptoms including vomiting and diarrhea. Plaintiff further testified that Ms. Craig had to have seen her coughing and sneezing on the first day of the evaluation, and that she told Ms. Craig on that day that her stomach was bothering her.
31. Plaintiff and her fiancé, Kenneth Eddins, testified that Mr. Eddins telephoned PT Pros on the morning of October 6, 2009 and informed a receptionist that Plaintiff was too sick to attend the second day of the evaluation.
32. Plaintiff did not present a doctor's note to substantiate her contention that she had flu-like symptoms on October 6, 2009. She testified that she could not go to a doctor because she had no health insurance.
33. The Full Commission deems Ms. Craig's testimony regarding Plaintiff's failure to report for the second day of the functional capacity evaluation more credible than that of Plaintiff and Mr. Eddins.
34. On October 8, 2009, Plaintiff presented to Dr. Gilchrist with continued complaints of right posterior shoulder and lateral arm pain. Plaintiff requested Oxycodone and became upset when Dr. Gilchrist informed her that he would not give her any narcotic medications as she had not taken them for five months. Dr. Gilchrist prescribed Lidoderm patches and advised Plaintiff to follow up with Dr. Hurley regarding the functional capacity evaluation report.
35. Pursuant to Dr. Gilchrist's instructions, Defendants scheduled an appointment for Plaintiff with Dr. Hurley on October 19, 2009 and arranged for Plaintiff to be transported to the *Page 11 
appointment. Plaintiff was not present when transportation arrived to pick her up on October 19, 2009, and the appointment was cancelled. Plaintiff subsequently informed rehabilitation consultant Connie Cook that there had been a family emergency and that she could not contact Ms. Cook to inform her because she did not have any minutes available on her cell phone.
36. Plaintiff's appointment with Dr. Hurley was subsequently re-scheduled for November 16, 2009. Plaintiff was notified of the appointment date and time and indicated that she did not require transportation. On November 13, 2009, Plaintiff informed Ms. Cook that she was sick with what she thought was the flu and she requested that the appointment with Dr. Hurley be re-scheduled.
37. Plaintiff was seen by Dr. Hurley on November 30, 2009. Dr. Hurley's examination revealed active and passive range of motion in the functional range for Plaintiff's right upper extremity, and rotator cuff strength testing showed reasonable strength with some discomfort. Dr. Hurley left his previous 10-pound and no overhead permanent lifting restrictions in place, again based on Plaintiff's statement that she could not do those things. Dr. Hurley also gave Plaintiff a 15% permanent partial impairment rating of her arm secondary to her work injury and subsequent surgery.
38. Dr. Hurley opined that it was possible that Plaintiff had a failed rotator cuff repair, but based on her full range of motion and good strength, he did not think it was worthwhile to order a repeat MRI.
39. Dr. Hurley noted that he was not surprised that Plaintiff had failed to complete the functional capacity evaluation. *Page 12 
40. Dr. Hurley opined that he had never had a patient request as many narcotics as Plaintiff, and that Plaintiff was addicted to narcotic pain medications and needed pain management to help wean her off of them.
41. Based upon the greater weight of the competent, credible evidence of record, including the more credible testimony of Ms. Craig, Ms. Cook's October 14, 2009 progress report, and Plaintiff's pattern of missed doctor and physical therapy appointments, the Full Commission finds that Plaintiff unjustifiably refused to comply with medical treatment when she failed to report for the second day of her functional capacity evaluation on October 6, 2009.
 ***********
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The Full Commission cannot conclude based upon the evidence of record that Plaintiff's apparent lack of full effort during the first day of the functional capacity evaluation in and of itself constituted an unjustified refusal to comply with medical treatment. N.C. Gen. Stat. § 97-25.
2. However, the Full Commission concludes that Plaintiff's failure to appear for the scheduled second day of the functional capacity evaluation on October 6, 2009 constituted an unjustified refusal to comply with medical treatment after having been ordered to do so by the Executive Secretary on September 16, 2009. Consequently, Defendants are entitled to suspend payment of temporary total disability compensation to Plaintiff beginning on October 6, 2009 and continuing until Plaintiff complies with the Executive Secretary's September 16, 2009 Order in full. Id. *Page 13 
3. Plaintiff is entitled to receive a second opinion regarding her right shoulder with a physician of her choice. Id.
4. Plaintiff is entitled to have Defendants provide her with further treatment for her compensable right shoulder condition, namely, further pain management with Dr. Gilchrist as recommended by Dr. Hurley. Id.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission makes the following:
 AWARD
1. Plaintiff's temporary total disability compensation IS HEREBY SUSPENDED, effective October 6, 2009. Defendants shall receive a credit against any future disability compensation to which Plaintiff may be entitled for all temporary total disability compensation paid to Plaintiff since that date.
2. If and when Plaintiff fully complies with the September 16, 2009 Order of the Executive Secretary, Defendants SHALL reinstate temporary total disability compensation to Plaintiff if she is entitled to it at that time, subject to the credit set out in Paragraph 1 above.
3. If they have not done so already, Defendants SHALL promptly schedule, authorize and pay for a second opinion for Plaintiff's right shoulder with a physician of her choice.
4. Defendants SHALL continue to provide Plaintiff with pain management treatment for her compensable right shoulder condition with Dr. Gilchrist. *Page 14 
5. Defendants shall pay the costs. As part of their costs, if they have not done so already, Defendants shall pay expert witness fees to the deponents, the amounts of which were set in Orders previously filed by Deputy Commissioner Harris.
This the ___ day of June, 2011.
 S/___________________ LINDA CHEATHAM COMMISSIONER
CONCURRING:
 S/___________________ STACI T. MEYER COMMISSIONER
 S/___________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1